UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| JEFFREY DUANE MOSES, | ) | CASE NO. C06-1105-MJP |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| ALICE PAYNE, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

Petitioner Jeffrey Duane Moses proceeds with counsel in this 28 U.S.C. § 2254 habeas action. (Dkt. 1.)  In 2003, petitioner was convicted in King County Superior Court of second-degree murder and unlawful first-degree firearm possession, and sentenced to an exceptional sentence of 420 months confinement.  (Dkt. 10, Ex. 1.)  The Washington Court of Appeals affirmed petitioner's conviction, but reversed the exceptional sentence and remanded for re-sentencing.  (*Id.*, Ex. 3.)  The trial court re-sentenced petitioner to 335 months in September 2006. (Dkt. 12, Ex. 1.)

Petitioner raises three grounds for relief in his habeas petition. (Dkt. 1.)  Respondent filed an answer to the petition with relevant portions of the state court record.  (Dkts. 7 & 10.) Respondent argues that petitioner failed to properly exhaust portions of his claims and that the remaining exhausted claims lack merit.  (Dkts. 7, 12 & 17.)  Petitioner asserts the exhaustion and

REPORT AND RECOMMENDATION
PAGE -1

01  merit of all of his claims.  (Dkts. 1, 11 & 21.) The Court has considered the record relevant to the

02  grounds raised in the petition, including all hearing transcripts.  For the reasons discussed herein,

03  it is recommended that petitioner's habeas petition be denied and this action dismissed.

04                              I

05      The Washington Court of Appeals summarized the facts surrounding petitioner's

06  conviction as follows:

> In the early morning of September 27, 2002, Moses' mother, who lived in
> California, called the police to report that her daughter-in-law, Jennifer Moses was
> dead.  The police found Moses on the street outside his house, drinking beer, and
> carrying his younger son on his back.  Moses' other son was asleep in the house.
> According to Moses, Jennifer short herself and committed suicide.  When the officers
> attempted to enter the house, he told them it was unnecessary because he had cleaned
> everything up.  Police found Jennifer wrapped in a rug in the garage, along with a pile
> of bloody towels and sponges.  Jennifer had a gunshot wound to her head, blunt force
> trauma to her lips and a cracked tooth.  The .410 gauge derringer used in Jennifer's
> death was found in the master bedroom.  The derringer had been recently cleaned and
> was loaded with two unspent shells.  When questioned, Moses told police Jennifer had
> been depressed and that she came downstairs that evening with the derringer, knelt
> down and shot herself in the head while Moses tried to get the gun away from her.
> Moses said he moved Jennifer's body to the garage to prevent their sons from seeing
> her.  He then backed his truck up to the garage to load her body into it and bury her
> in the woods, as she had requested.  When the truck hit a post, Moses said he
> abandoned the attempt to move Jennifer's body.
>
> Moses was charged with premeditated murder in the first degree and unlawful
> possession of a firearm.  The State alleged Moses intentionally shot Jennifer during
> a domestic dispute.  The defense theory was that Jennifer committed suicide because
> she had a history of depression and suicidal ideation, together with drug and alcohol
> use.  Over Moses' objection, the trial court admitted out-of-court hearsay statements
> made by Jennifer and his children to police, a doctor and a social worker about prior
> domestic violence.

20  (Dkt. 10, Ex. 3 at 2-3.)

21      Petitioner appealed his conviction to the Washington Court of Appeals.  (*Id.*, Ex. 2.)  His

22  counsel raised the following grounds for review:

REPORT AND RECOMMENDATION
PAGE -2

**A.   ASSIGNMENTS OF ERROR**

1.   The trial court erred in admitting evidence of Mr. Moses's alleged prior bad acts.

2.   The trial court erred in admitting Jennifer Moses's out-of-court testimonial statements.

3.   The trial court erred in admitting evidence of the out-of-court statements of Forrest Moses to social worker Tamara Muller.

4.   The trial court erred in excluding evidence of Jennifer Moses's suicidal thoughts, as expressed in her written journal.

5.   The trial court erred in excluding evidence that Jennifer Moses indicated to a friend that she could kill herself and her children.

6.   The trial court erred in redacting Jennifer Moses's on-line computer journal and treatment records.

7.   The trial court erred in limiting the evidence of Jennifer Moses's hand-written diary.

8.   The trial court erred in excluding the testimony of Dr. Wilson.

9.   The trial court erred in admitting the testimony of Dr. Harruff that the death was a homicide.

10.   The trial court erred in excluding the autopsy photograph.

11.   The trial court erred in permitting opinion testimony as to guilt by ballistic expert Thompson and social worker Muller.

12.   The trial court's limiting instruction on the use of ER 404(b) evidence was a comment on the evidence.

13.   Cumulative error denied Mr. Moses a fair trial.

14.   The trial court erred imposing an exceptional sentence.

**B.   ISSUES PERTAINING TO ASSIGNMENTS OF ERROR**

1.   Where proof that Mr. Moses shot his wife would conclusively establish

REPORT AND RECOMMENDATION
PAGE -3

his intent to take her life, was the admission of his alleged prior bad acts relevant only to prove that he was the type of person to have committed the crime and inadmissible under ER 404(b)?

2. Did the trial court deny Mr. Moses his state and federal constitutional right to confrontation of witnesses by admitting the out-of-court testimonial statements of Mr. Moses's deceased wife?

3. Did the trial court deny Mr. Moses his state and federal constitutional rights to confrontation of witnesses by admitting the out-of-court testimonial statements of his son Forrest?

4. Did the trial court's exclusion of evidence of Jennifer Moses's suicidal thoughts; of her sexual abuse as a child, which contributed to her depression; of her concern over CPS involvement and of her eating disorder, deny Mr. Moses his state and federal constitutional right to present a defense and to call witnesses in his own behalf?

5. Did the trial court's limitation of evidence from Jennifer Moses's handwritten diary violate Mr. Moses's state and federal constitutional rights to defend at trial?

6. Did the trial court's exclusion of the testimony of Dr. Wilson on the relationship between major depression and suicide and his testimony that Jennifer Moses was suffering from major depression at the time of her death violate Mr. Moses's state and federal constitutional rights to present a defense and call witnesses in his own behalf?

7. Did the admission of testimony of Dr. Haruff that the death was homicide invade the province of the jury and constitute an impermissible opinion as to guilt, in violation of Mr. Moses's state and federal constitutional rights to a jury trial?

8. Did opinion testimony by ballistic expert Evan Thompson, without foundation, that the death was a homicide, deny Mr. Moses his state and federal constitutional rights to a jury trial?

9. Did opinion testimony by social worker Tamara Muller that victims of domestic violence are most likely to be killed when they leave home constitute profile testimony and invade the province of the jury, in violation of Mr. Moses's state and federal constitutional rights?

10. Was the trial court's limiting instruction that evidence of prior bad acts

REPORT AND RECOMMENDATION
PAGE -4

could be used to determine the nature of the relationship between the Moseses, a comment on the evidence in violation of the constitution?

11. Did the cumulative error of excluding evidence relevant to Mr. Moses's defense while admitting improper opinion evidence as to guilt and improper character evidence deny Mr. Moses a fair trial?

12. Must Mr. Moses's exceptional sentence be reversed because the factors supporting the exceptional sentence were not determined by the jury beyond a reasonable doubt, as required by <u>Blakely v. Washington</u>?

13. Did the trial court's reliance on contested facts, on reasons which were not supported by the record and on Mr. Moses's exercise of his first amendment rights require the reversal of Mr. Moses's exceptional sentence and a remand for resentencing before a different judge?

14. Did the trial court impose a clearly excessive sentence?

(*Id.*, Ex. 2 at 1-5.)

The Washington Court of Appeals affirmed the conviction, but reserved the exceptional sentence and remanded for re-sentencing. (*Id.*, Ex. 3.) Petitioner petitioned for review, raising the following issues:

1. Does the decision of the United States Supreme Court in *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L.Ed. 2d 177 (2004), preclude the introduction of hearsay statements made to an emergency room physician and hospital social worker where the declarant is taken to the hospital by the police after responding to a 911 call?

Are such statements inadmissible under the Sixth Amendment as testimonial hearsay because they were made under circumstances that would lead an objective witness reasonably to believe that the statements would be used prosecutorially and inadmissible even under the ordinary rules of hearsay?

2. Can the trial court constitutionally, under the state and federal constitutions, preclude the defense from presenting relevant evidence in support of the defense theory that the death which gave rise to the charge was a suicide and allow the state to present evidence that the alleged victim was doing well and not depressed at the time of her death?

REPORT AND RECOMMENDATION
PAGE -5

3.      Where proof that the defendant shot his wife would conclusively establish his intent to take her life, was the admission of his alleged prior bad acts relevant only to prove that he was the type of person to have committed the crime and inadmissible under ER 404(b)?

4.      Does opinion testimony, which is based on a review of information outside the expert's area of expertise, that the death was not a result of suicide and other opinion testimony that victims of domestic violence are most likely to be killed when they try to leave the home invade the province of the jury and deny the defendant his state and federal constitutional rights to a jury trial and to a jury determination based on the evidence presented at trial?

5.      Can the Court of Appeals properly find harmless error while admitting that the trial court violated the defendant's Sixth Amendment rights in admitting testimonial hearsay from a police officer reporting the details of an assault by the defendant against the victim and violated the defendant's right to present a defense in excluding entries from the victim's personal diary for the same period in which it allowed the state to introduce entries from her public, on-line diary?

. . .

6.      Was the trial court's limiting instruction that evidence of prior bad acts could be used to determine the nature of the relationship between the defendant and his wife, a comment on the evidence in violation of the Washington constitution?

(*Id.*, Ex. 4 at 1-3.)  The Washington Supreme Court denied the petition for review without discussion.  (*Id.*, Ex. 5.)

II

Petitioner now raises the following grounds for relief:

**GROUND ONE:**

[Denial] of the 6th amendment right to confrontation by the admission of testimonial hearsay

. . .

The issue for the jury at trial was whether Jennifer Moses committed suicide while her husband Jeffrey Moses tried to prevent her from doing so or whether he shot her.

REPORT AND RECOMMENDATION
PAGE -6

The state was permitted to introduce evidence of Mr. Moses's alleged prior bad acts against his wife. The state, in fact, made what it called the "Halloween incident" a centerpiece of its case. The state called as witnesses the deputy who responded to the 911 call on Halloween, the physician who treated Jennifer at the hospital where the police took her, the social worker who interviewed her at the [hospital] and the 911 tape of a neighbor and Jennifer reporting the incident. The social worker was also permitted to testify about statements made by the Moses children, who wer[e] not called as witnesses at trial.

Although the Court of Appeals held that Jennifer Moses's statements to the police were testimonial hearsay, the court held that [t]he statements to the emergency room doctor and social worker, as well as her son's [statements] to the social worker, were not testimonial hearsay.

. . .

**GROUND TWO:**

Denial of rights under the 6th and 14th [amendments] to appear and defend at trial, to compulsory process and to due process of law.

. . .

The trial court excluded evidence supporting the defense suicide theory. The court permitted the prosecution to introduce Jennifer Moses's on-line journal, but excluded many of her expressions of suicidal ideation in her concurrently-written private journal. Even in the on-line journal and her medical records her threats regarding the children, evidence of her eating disorder and her childhood sex abuse which contributed to her depression and alcoholism were deleted. The court also excluded testimony of a defense expert explaining why, to a reasonable medical certainty, Jennifer still suffered from major depression at the time of her death and how major depression, along with alcohol and drug abuse, can increase the likelihood of suicide. The trial court excluded an autopsy photo showing the extent of her eating disorder. At the same time, the court allowed the state to introduce testimony of lay witnesses that Jennifer was doing fine psychologically at the time of her death. As a result, the prosecutor was able to argue that she was fully recovered when she died and her only problem was her husband. The Court of Appeals held that it was error to exclude Jennifer's private journal in favor of her on-line journal, but failed to acknowledge other one-sided decisions on the admissibility of evidence and failed to address the constitutional dimension of the issue.

. . .

REPORT AND RECOMMENDATION
PAGE -7

01    **GROUND THREE**:

02    Denial of the 6th amendment right to a jury trial because the admission of opinion
      testimony as to guilt invaded the province of the jury.

03

      . . .

04

05    The prosecution was permitted, over defense objection, to elicit the opinion of the
      medical examiner that Jennifer's death was a homicide. In making that determination,
      the medical examiner did not rely on his expertise as a pathologist, but on his review
06    of portions of Jennifer's diary selected by the prosecuto[r], statements by Mr. Moses
      and the ballistics report. He admitted that most deaths from contact wounds, like
07    Jennifer's, are suicides. The ballistics examiner agreed that most deaths from contacts
      wounds are suicides and that suicide was possible in Jennifer Moses's case; but over
08    defense objection, he was permitted to testify to a reasonable ballistics certainty the
      death was a homicide. The social worker who interviewed Jennifer after the domestic
09    violence call was permitted to testify that a domestic violence victim is most likely to
      be killed when she leaves.

10

11    (Dkt. 1 at 6-9.)

12         Respondent asserts that petitioner failed to properly exhaust parts of his first claim and his

13    entire third claim. Respondent further argues that all three of petitioner's claims fail on the merits.

14    The Court addresses respondent's exhaustion argument first.

15                                                III

16         "An application for a writ of habeas corpus on behalf of a person in custody pursuant to

17    the judgment of a State court shall not be granted unless it appears that . . . the applicant has

18    exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). To

19    exhaust state remedies, a petitioner must present each of his claims to the state's highest court.

20    *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *James v. Borg*, 24 F.3d 20, 24 (9th Cir. 1994).

21    A petitioner must "alert the state courts to the fact that he was asserting a claim under the United

22    States Constitution." *Hiivala v. Wood*, 195 F.3d 1098, 1106 (9th Cir. 1999) (citing *Duncan v.*

REPORT AND RECOMMENDATION
PAGE -8

01 *Henry*, 513 U.S. 364, 365-66 (1995)). "The mere similarity between a claim of state and federal

02 error is insufficient to establish exhaustion." *Id.* (citing *Duncan*, 513 U.S. at 366). "Moreover,

03 general appeals to broad constitutional principles, such as due process, equal protection, and the

04 right to a fair trial, are insufficient to establish exhaustion." *Id.* (citing *Gray v. Netherland*, 518

05 U.S. 152, 162-63 (1996)).

06       Respondent first argues that petitioner failed to exhaust his first ground for relief in full,

07 pointing to the admission of his statement to a deputy who responded to a 911 call and the 911

08 call made by a neighbor.  However, petitioner does not challenge the admission of that evidence.

09 (*See* Dkt. 1, Attach. 1 at 6-9 and Dkt. 11 at 1.)[1]

10       Respondent's remaining exhaustion argument concerns petitioner's third ground for relief.

11 Respondent maintains that petitioner failed to present this ground as a federal constitutional

12 violation in the state courts.  Respondent avers that, instead, petitioner referred only generally to

13 his "federal constitutional rights" in the Washington Court of Appeals and "a constitutional issue

14 of considerable public importance" in the Washington Supreme Court.  (Dkt. 10, Ex. 2 at 46 and

15 Ex. 4 at 16.)  In neither court did petitioner cite a specific constitutional provision or any federal

16 case law.  Respondent maintains that this manner of presentation could not have indicated to the

17 Washington courts whether petitioner intended to allege a denial of his Sixth Amendment right to

18 a jury trial, as he does in his habeas petition.

19 _____

20     [1] In a supplemental answer, respondent claimed she had also originally argued that petitioner had not exhausted the portion of his first ground for relief relating to statements made

21 by petitioner's son. (Dkt. 17 at 8.)  However, the Court finds no such argument in respondent's original answer.  (*See* Dkt. 7 at 13.)  Moreover, contrary to respondent's contention, the Court

22 concludes that petitioner did raise this claim as a federal constitutional violation in the Washington Supreme Court.  (*See* Dkt. 10, Ex. 4 at 9.)

REPORT AND RECOMMENDATION
PAGE -9

01    In the Washington Court of Appeals, petitioner argued that the admission of certain expert

02 testimony "invaded the province of the jury and denied Mr. Moses his state and federal

03 constitutional rights to a jury trial and a verdict based on the evidence introduced at trial." (*Id.*,

04 Ex. 2 at 46 (emphasis removed.)) (*See also id.* at 55 (arguing testimony "constituted impermissible

05 opinion as to guilt and violated Mr. Moses's state and federal constitutional rights to a jury trial

06 and to have the jury decide the case on the evidence presented at trial.")) In the argument portion

07 of his petition for review in the Washington Supreme Court, petitioner referred only generally to

08 a "constitutional" violation. (*Id.*, Ex. 4 at 16.)  However, in setting out the issues presented for

09 review earlier in the petition, petitioner specified that this contention alleged a violation of his

10 "state and federal constitutional rights to a jury trial and to a jury determination based on the

11 evidence presented at trial[.]" (*Id.* at 2.)  The Court concludes that, despite the absence of any

12 direct reference to the Sixth Amendment or citation to federal case law, petitioner put the state

13 courts on notice that he alleged a violation of his federal constitutional right to a jury trial through

14 the admission of opinion testimony which invaded the province of the jury.

15    Finding petitioner's claims exhausted, the Court directs its attention to the merits of his

16 claims.

17                                         IV

18    This Court's review of the merits of petitioner's claims is governed by 28 U.S.C. §

19 2254(d)(1).  Under that standard, the Court cannot grant a writ of habeas corpus unless a

20 petitioner demonstrates that he is in custody in violation of federal law and that the highest state

21 court decision rejecting his grounds was either "contrary to, or involved an unreasonable

22 application of, clearly established Federal law, as determined by the Supreme Court of the United

REPORT AND RECOMMENDATION
PAGE -10

01  States." 28 U.S.C. § 2254(a) and (d)(1).  The Supreme Court holdings at the time of the state

02  court decision will provide the "definitive source of clearly established federal law[.]"  *Van Tran*

03  *v. Lindsey*, 212 F.3d 1143, 1154 (9th Cir. 2000), *overruled in part on other grounds by Lockyer*

04  *v. Andrade*, 538 U.S. 63 (2003).  A state-court decision is contrary to clearly established

05  precedent if it "'applies a rule that contradicts the governing law set forth in'" a Supreme Court

06  decision, or "'confronts a set of facts that are materially indistinguishable'" from such a decision

07  and nevertheless arrives at a different result.  *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting

08  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).

09  <u>Ground One</u>

10  Petitioner's first ground for relief challenges the admission of testimony by an emergency

11  room doctor and social worker pertaining to an incident that occurred on or about November 1,

12  2001.  Both the doctor and social worker testified that Jennifer Moses stated that petitioner hit

13  and/or kicked her in the face.  (*See* Dkt. 10, Ex. 6 at 15 and 64-65.)  The social worker also

14  testified that petitioner's younger son stated that petitioner kicked Jennifer Moses in the head.  (*Id.*

15  at 66-67.)  Petitioner argues that the admission of this testimony denied him the right to confront

16  witnesses against him in violation of the Sixth Amendment and contrary to the decisions of the

17  United States Supreme Court in *Crawford v. Washington*, 541 U.S. 36 (2004), and  *Davis v.*

18  *Washington*, ___ U.S. ___, 126 S.Ct. 2266 (2006).

19  Without citation to legal authority or any significant discussion, respondent asserts that

20  plaintiff waived the issue by failing to object to the admission of this testimony at trial.  (*See* Dkt.

21  10, Ex. 6 at 67.)  Respondent further argues that, even if petitioner had objected, the claim fails.

22  Because this issue can be resolved on the merits, the Court declines to delve into the ramifications

REPORT AND RECOMMENDATION
PAGE -11

01  of any failure to object at trial.

02      The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal

03  prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against

04  him." U.S. Const. Amend. VI.  In *Ohio v. Roberts*, 448 U.S. 56, 66 (1980), the United States

05  Supreme Court held that the Confrontation Clause does not bar the admission of an out-of-court

06  statement of an unavailable witness so long as the statement bears "adequate indicia of reliability."

07  Under *Roberts*, an out-of-court statement meets the reliability test if it falls within a "firmly rooted

08  hearsay exception" or bears "particularized guarantees of trustworthiness."  *Id.*  Where evidence

09  falls within a firmly rooted hearsay exception, reliability can be inferred.  *Id.*

10      In *Crawford*, the Supreme Court partially abrogated *Roberts*.  The Court drew a

11  distinction between testimonial and non-testimonial hearsay, and rejected the *Roberts* test as to

12  testimonial hearsay statements.  *Crawford*, 541 U.S. at 68-69.  The Court held that testimonial

13  hearsay statements  are barred under the Confrontation Clause unless the declarant is unavailable

14  and the defendant had prior opportunity to cross-examine the declarant.  *Id.*  The Ninth Circuit

15  subsequently held that the Supreme Court's decision in *Crawford* applies retroactively to collateral

16  proceedings.  *Bockting v. Bayer*, 399 F.3d 1010, 1013-21 (9th Cir. 2005), *amended by* 408 F.3d

17  1127 (9th Cir. 2005), *cert. granted in Whorton v. Bockting*, 126 S. Ct. 2017 (2006).  Accordingly,

18  the first question this Court must address is whether the statements at issue here were

19  "testimonial" and, therefore, subject to the rule announced in *Crawford*.

20      The Supreme Court did not spell out a comprehensive definition of "testimonial" in

21  *Crawford*.  641 U.S. at 68.  The Court discussed "three formulations of [the] core class of

22  'testimonial'" statements: (1) "'*ex parte* in-court testimony or its functional equivalent--that is,

REPORT AND RECOMMENDATION
PAGE -12

01  material such as affidavits, custodial examinations, prior testimony that the defendant was unable

02  to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used

03  prosecutorially,'" (2) "'extrajudicial statements . . . contained in formalized testimonial materials,

04  such as affidavits, depositions, prior testimony, or confessions,'" and (3) "'statements that were

05  made under circumstances which would lead an objective witness reasonably to believe that the

06  statement would be available for use at a later trial[.]'" *Id*. at 51-52 (omission in original) (quoted

07  sources omitted).  Later in the decision, the Court specified that the term testimonial "applies at

08  a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and

09  to police interrogations." *Id*. at 68.  Federal courts have since recognized that "*Crawford* at least

10  suggests that the determinative factor in determining whether a declarant bears testimony is the

11  declarant's awareness or expectation that his or her statements may later be used at a trial." *United*

12  *States v. Saget*, 377 F.3d 223, 228 (2d Cir. 2004).

13       In *Davis*, the Supreme Court more closely examined police interrogations.  The Court

14  found nontestimonial statements "made . . . under circumstances objectively indicating that the

15  primary purpose of the interrogation is to enable police assistance to meet an ongoing

16  emergency[,]" and testimonial statements made under circumstances "objectively indicat[ing] that

17  there is no such ongoing emergency, and that the primary purpose of the interrogation is to

18  establish or prove past events potentially relevant to later criminal prosecution."  126 S.Ct. at

19  2273-74.

20  A.   Testimonial Analysis

21       Following a discussion of *Crawford*, *Davis*, and other relevant case law, the Washington

22  Court of Appeals held as follows with respect to the statements at issue here:

REPORT AND RECOMMENDATION
PAGE -13

01  Statements Made for Medical Diagnosis or Treatment

02      Moses challenges the trial court's decision to admit Dr. Appleton's testimony
about what Jennifer told him about the assault and the social worker's testimony
03  about what Jennifer and F.M. told her.  Moses argues these out-of-court statements
violated his right to the confrontation under Crawford.  In treating Jennifer's injuries,
04  the emergency room physician, Dr. Warren Appleton, interviewed and examined
Jennifer.   Jennifer told Dr. Appleton that her husband assaulted her and she
05  complained of neck and jaw pain.  Dr. Appleton testified that Jennifer's jaw was
broken "through and through," that her broken jaw was caused by more than one
06  blow and that her injuries were not consistent with falling.  Dr. Appleton testified that
Jennifer appeared frightened.  Because of the domestic nature of the assault, Dr.
07  Appleton referred Jennifer and her sons to a social worker as part of treatment.  The
hospital social worker, Tamara Muller, interviewed the boys and Jennifer as part of
08  the treatment plan.

09      Under ER 803(a)(4), "[s]tatements made for purposes of medical diagnosis
or treatment and describing medical history, or past or present symptoms, pain, or
10  sensations, or the inception or general character of the cause of external source
thereof insofar as reasonably pertinent to diagnosis or treatment" are admissible.  For
11  statements to be admissible under ER 803(a)(4), the declarant's apparent motive must
be consistent with receiving treatment, and the medical provider must reasonably rely
12  on the information for diagnosis or treatment.  State v. Lopez, 95 Wn. App. 842, 849,
980 P.2d 224 (1999).  Although statements attributing fault are generally not relevant
13  to diagnosis or treatment, this court has found statements attributing fault to an
abuser in a domestic violence case are an exception because the identity of the abuser
14  is pertinent and necessary to the victim's treatment.  State v. Sims, 77 Wn. App. 236,
239-40, 890 P.2d 521 (1995) (Victim's statements to ER doctor and social worker
15  were admissible where victim identified her boyfriend as the person who broke her
jaw).

16
17      Courts that have addressed Crawford's impact on statements admitted under
the medical diagnosis and treatment exception focus on the purpose of the declarant's
18  encounter with the health care provider.  In State v. Fisher, __ Wn. App. __, 108 P.3d
1262, 1269 (2005), the court held that the statement made by a victim of child abuse
19  to a physician was not testimonial.  The victim made the statement the morning after
the assault, when the physician asked the child what happened.  In concluding the
20  victim's statement was not testimonial, the court noted that the doctor was not a
government employee and there was no indication of a purpose to prepare testimony
21  for trial.  Fisher, 108 P.3d at 1269.  In State v. Vaught, 268 Neb. 316, 325-26, 682
N.W.2d 284 (2004), the Nebraska Supreme court held that a four-year-old's
22  identifying statements to a doctor were not testimonial.  The court determined that
the only purpose of the medical examination was to provide medical treatment and

REPORT AND RECOMMENDATION
PAGE -14

there was no indication of a purpose to develop testimony for trial.      Id. at 326. Similarly, in State v. Scacchetti, 690 N.W.2d 393, 396 (Minn. Ct. App. 2005), the court held a statement made by a three-year-old victim of sexual abuse to a nurse was not testimonial.  The victim's statement was in response to the nurse's question about whether anything happened.  The court noted that the nurse sought information to provide a medical diagnosis and was not working on behalf of, or in conjunction with, investigating police officers or other government officials for the purpose of developing testimony for prosecution.  Id.

In cases where courts have found statements to health care providers are testimonial, the prosecutorial purpose of the medical examination has been clear. People v. Vigil, 104 P.3d 258, 265 (Colo. App. 2004); In re T.T., 351 Ill. App. 3d 976, 993, 815 N.E.2d 789 (2004).  In  Vigil, the case relied on by Moses, a seven-year-old child made a statement identifying the perpetrator of a sexual assault to a doctor.  104 P.3d at 265.  The court in      Vigil found the victim's statement was testimonial because the doctor was a member of a child protection team that provided consultation services in cases of suspected child abuse, and the doctor performed a 'forensic sexual abuse examination.'"  Id.  In T.T., the court held that the victim's statement identifying the perpetrator was testimonial because the medical examination was done six months after the assault, for the purpose of pursuing a prosecution.  351 Ill. App. 3d at 993.  See also People v. Sisavath, 118 Cal. App. 4th 1396 (Ct. App. 2004); Snowden v. State, 156 Md. App. 139, 846 A.2d 36 (2004).

This case is more similar to Fisher and Vaught.  Jennifer was taken to the emergency room of the hospital shortly after the assault for serious injuries.  The ER doctor, Dr. Appleton, testified that he questioned Jennifer in order to provide treatment.  Dr. Appleton examined Jennifer and asked her what had happened and then ordered x-rays of Jennifer's jaw.  And unlike Vigil and T.T., the purpose of Dr. Appleton's examination was for medical diagnosis and treatment of Jennifer's significant injuries.  Dr. Appleton had no role in the investigation of the assault and he was not working on behalf of or in conjunction with the police or governmental officials to develop testimony for the prosecution.  There is also nothing in the record to indicate Jennifer believed or had reason to believe that her statements to Dr. Appleton would be used at a subsequent trial.  We conclude that Jennifer's statements to Dr. Appleton were not testimonial under Crawford.

Statements to Social Worker

An out-of-court statement to a social worker is also admissible if made in the course of diagnosis and treatment.   Sims, 77 Wn. App. at 239-240.  Two post-Crawford cases have addressed statements to social workers, each holding that the statements were testimonial.  T.T., 351 Ill. App. 3d at 801; Snowden, 156 Md. App. at 157.  In both T.T. and Snowden, the social workers were interviewing children on

behalf of the State for the express purpose of gathering evidence for a future prosecution or developing the children's testimony for prosecution.

Here, the hospital social worker, Muller, testified that while Jennifer was sleeping off the effects of the pain medication, she interviewed the children. F.M. told Muller that he saw Moses kick Jennifer. Both children reported regular fights between Moses and Jennifer that caused them to hide under their beds. After talking to the children, Muller called CPS to report the assault. When Jennifer woke up, Muller interviewed her. Muller testified that Jennifer was initially reluctant to talk about the assault, but was generally cooperative. Jennifer identified Moses as her assailant, and told Muller that Moses kicked her in the jaw. At some point during the interview, Muller told Jennifer that she had contacted CPS to report domestic violence.

Because the trial occurred prior to the Supreme Court's decision in <u>Crawford</u>, the record is not clear when Jennifer identified Moses as her assailant during the course of the interview with Muller. Nor is it clear when Muller told Jennifer that she had contacted CPS. Like Dr. Appleton, Muller was providing treatment to Jennifer and statements in that context are not testimonial. <u>State v. Sims</u>, 77 Wn. App. at 239-40. But once Muller told Jennifer that she had contacted CPS, Jennifer would have been aware of the potential implications of her statements to Muller, and, under those circumstances, Muller's testimony about Moses' assault could be impermissible testimonial hearsay under <u>Crawford</u>.

The State contends that F.M.'s statement to the social worker is not testimonial hearsay because it was not offered to prove the truth of the matter asserted. The <u>Crawford</u> Court explicitly excluded testimonial statements that were not introduced for the truth of the matter asserted from a Confrontation Clause analysis. <u>Crawford</u>, 541 U.S. at 59 n.9. At trial, the State asked Muller why she contacted CPS. Muller testified that she contacted CPS because F.M. told her that his dad kicked his mom. We conclude that F.M.'s statement was not introduced for the truth of the matter asserted, but to show why Muller contacted CPS. F.M.'s statements did not implicate <u>Crawford</u>, and the trial court did not err in admitting this testimony.

Harmless Error

Moses argues that admission of Jennifer's out-of-court testimonial statements

01  to the police and the social worker was not harmless error.[2]  We disagree.

02  Violation of a defendant's rights under the Confrontation Clause is constitutional error.  State v. McDaniel, 83 Wn. App. 179, 187-188, 920 P.2d 1218

03  (1996) (citing Harrington v. California, 395 U.S. 250, 251-52, 89 S. Ct. 1726, 23 L. Ed. 2d 284 (1969)).  It is well established that constitutional errors, including

04  violations of a defendant's rights under the Confrontation Clause, may be harmless. State v. Guloy, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985) (citing Harrington, 395

05  U.S. at 251-52); Davis, 154 Wn.2d at 304.  "The correct inquiry is whether, assuming that the damaging potential of the [testimony] were fully realized, a reviewing court

06  might nonetheless say that the error was harmless beyond a reasonable doubt." Delaware v. Van Arsdall , 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674

07  (1986).  The reviewing court must look at the untainted evidence to determine if it is so overwhelming that it necessarily leads to a finding of guilt.  Davis, 154 Wn.2d at

08  304.

09  The improper testimonial evidence consisted of Jennifer identifying Moses as her assailant in the November 2001 assault, and a brief recitation of Jennifer's

10  description of the assault by the officer, who responded to the 911 call and interviewed her.  The untainted independent evidence of the 2001 assault includes

11  multiple witnesses who identified Moses as Jennifer's assailant, evidence documenting Jennifer's injuries and expert testimony that Jennifer's broken jaw was not the result

12  of a slip and fall.  The officer responding to the 911 call also described Jennifer's injuries and the scene at the house, including the phone ripped from the wall.  In

13  addition, the jury heard testimony about arguments prior to Jennifer's death and an argument four days before that resulted in Moses' arrest on an outstanding warrant

14  for the pending domestic violence charge, as well as heated argument the night of Jennifer's murder.  None of this testimony violated   Crawford.  We conclude the

15  untainted evidence leads to a finding of guilt and any error in admitting Jennifer's testimonial statements was harmless beyond a reasonable doubt.

16

17  (Dkt. 10, Ex. 3 at 9-14 (internal footnoted citations to record omitted.))

18  Petitioner asserts that the state court improperly deemed Jennifer Moses's statements

19  nontestimonial because they fit within a state evidentiary rule and erroneously assumed that only

20  _____

21  [2] Because petitioner does not here challenge the state court's ruling as to statements made by Jennifer Moses to the police, the Court omits the portion of the state court decision discussing

22  that evidence in relation to *Crawford* and *Davis*.

REPORT AND RECOMMENDATION
PAGE -17

01   statements to police or governmental agents can be testimonial.  He further argues that, even

02   assuming the application of the correct legal principles, the state court applied the principals

03   unreasonably to the facts in this case.

04        Petitioner states that, at the time she made the statements at issue, Jennifer Moses had

05   already made a criminal complaint to the police, that the police had taken her to the hospital, and

06   that there was no ongoing emergency.  He asserts that Jennifer Moses's accusatory statements as

07   to fault and identity were not essential to the emergency treatment of her injuries.  Petitioner

08   further notes that doctors and social workers routinely testify in criminal cases involving alleged

09   domestic violence.

10        With respect to the statements of petitioner's son, petitioner argues that the state court's

11   reasoning is contrary to the well-established principle that evidence is not admissible to establish

12   a non-hearsay purpose which is not relevant to any issue at trial.  *State v. Aaron*, 57 Wn. App.

13   277, 280-81, 787 P.2d 949 (1990).  Petitioner asserts that this evidence, rather than being offered

14   to show why the social worker contacted Child Protective Services ("CPS"), served to establish

15   that petitioner and Jennifer Moses had argued with one another, and constituted testimonial

16   hearsay.

17        The Washington Court of Appeals did not find the contested statements nontestimonial

18   because they fit within a state evidentiary rule.  Instead, the court described the medical diagnosis

19   or treatment exception prior to a discussion of case law applying *Crawford* to statements admitted

20   under that exception, and thereafter analyzed whether the contested statements could be deemed

21   impermissible testimonial hearsay under  *Crawford*.  Moreover, as addressed below, the state

22   court's discussion of the medical diagnosis or treatment exception bears relevance to the inquiry

REPORT AND RECOMMENDATION
PAGE -18

01 into the reliability of nontestimonial statements.

02        Nor did the state court assume that only statements made to police or governmental agents

03 can be testimonial, or otherwise improperly apply the legal principles laid out in *Crawford* and

04 *Davis*. As discussed below, the Court concludes that the decision of the state court with respect

05 to all of the testimony at issue was not contrary to, nor did it involve an unreasonable application

06 of, clearly established federal law.[3]

07        1.        Statements Made by Jennifer Moses to Emergency Room Doctor:

08        As noted by respondent, the doctor was not a government official and there were no police

09 present during his examination of Jennifer Moses.  Jennifer Moses's statements occurred within

10 the context of a medical examination in an emergency room and were prompted by questions

11 necessary to her treatment.  Petitioner's assertion that the statements as to fault and identity were

---

13        [3] In a reply, respondent argued that, before application of *Crawford*, the Court should rule
that by murdering Jennifer Moses, petitioner by his own misconduct forfeited his Sixth
14 Amendment right to cross-examination. *See Crawford*, 541 U.S. at 62 ("[T]he rule of forfeiture
by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable
grounds; it does not purport to be an alternative means of determining reliability.") (citing
15 *Reynolds v. United States*, 98 U.S. 145, 158-59 (1878) ("The Constitution gives the accused the
right to a trial at which he should be confronted with the witnesses against him; but if a witness
16 is absent by [the accused's] own wrongful procurement, he cannot complain if competent evidence
is admitted to supply the place of that which he has kept away.")) However, as argued by
17 petitioner, the application of the forfeiture by misconduct doctrine in this case – where the
question of petitioner's responsibility for the death of his wife was the very issue before the jury
18 – would have unconstitutionally denied petitioner the presumption of innocence.  (*See also* Dkt.
21 at 6-10 (discussing how cases applying this doctrine are distinguishable from the circumstances
19 involved here in, for example, involving situations in which a defendant refused to disclose the
whereabouts of a witness, boycotted a trial, engaged in disruptive behavior in the courtroom, or
20 otherwise engaged in deliberate activity directed at keeping a witness from testifying at trial)). *Cf.*
*United States v. Rouco*, 765 F.2d 983, 985-87, 995 (11th Cir. 1985) (applying doctrine where a
21 defendant faced trial for the alleged murder of a witness, where the murder took place during the
arrest of the defendant in front of multiple government officials, and where the defendant admitted
22 shooting the witness and claimed self defense).

REPORT AND RECOMMENDATION
PAGE -19

01    not essential to the emergency treatment of the injuries in this alleged domestic violence incident

02    is not well taken.

03         The circumstances at issue here would not have reasonably lead Jennifer Moses to suspect

04    that her statements would later be used as evidence in a prosecution of her husband.  In fact, the

05    circumstances bear a similarity to those involved in a case distinguished here by the Washington

06    Court of Appeals, but later reversed by the Supreme Court of Colorado.  *See People v. Vigil*, 127

07    P.3d 916, 923-24 (Colo. 2006), *cert. denied* 127 S.Ct. 86 (2006).   As in *Vigil*, "rather than being

08    an agent of the police, the doctor's job involved identifying and treating" the medical issue at hand.

09    *Id.  See also Miller v. Fleming*, No. C04-1289P, 2006 U.S. Dist. LEXIS 17284 at *16-18 (W.D.

10    Wash. Feb. 21, 2006) ("Here, as in <u>Vigil</u>, there is no evidence that Nurse Martinez or Dr. Minten

11    were  government  officials,  nor  is  there  evidence  that  the  police  were  present  during  their

12    examinations.") The mere fact that doctors routinely testify in cases involving alleged instances

13    of domestic violence does not alter this conclusion.  *See id.* at *18  ("Although the nurse and the

14    physician followed a strict protocol used in examining sexual assault victims that included the

15    collection of evidence, the Court does not regard that consideration as sufficient to support a

16    conclusion that K.'s statements were 'testimonial' under <u>Crawford</u>.  Instead, the Court agrees with

17    and applies the reasoning of the Colorado Supreme Court in <u>Vigil</u>."); *Vigil*, 127 P.3d at 923-24

18    ("The fact that the doctor was a member of a child protection team does not, in and of itself, make

19    him a government official absent a more direct and controlling police presence[.]") *See also State*

20    *v. Scacchetti*, 711 N.W.2d 508, 515 (Minn. 2006) ("Moreover, the mere fact that Edinburgh may

21    be called to testify in court regarding sexual abuse cases does not transform the medical purpose

22    of the assessments into a prosecutorial purpose, nor is there any evidence that Edinburgh had a

REPORT AND RECOMMENDATION
PAGE -20

01  prosecutorial purpose here.")

02      For all of these reasons, the Court concludes that Jennifer Moses's statements to the

03  emergency room doctor were nontestimonial.  Accordingly, they were properly admitted under

04  *Crawford/Davis.*

05          2.      Statements Made by Jennifer Moses to Social Worker:

06      Petitioner's argument does not distinguish between statements made by Jennifer Moses to

07  the emergency room doctor and to the social worker.  Similarly, respondent again points to the

08  lack of any police involvement in the social worker's interview or any police-related role for the

09  social worker.  Respondent asserts that the social worker's role in this case was to collect

10  information from Jennifer Moses in order to identify whether she was a victim of domestic

11  violence in need of resources, and whether to contact CPS to protect the well-being of any

12  children involved.  Respondent adds that records do not show that the information collected was

13  intended for use at a future prosecution or that the social worker was authorized to contact the

14  police or the prosecuting attorney's office.

15      Neither petitioner nor respondent acknowledges the determination of the Washington

16  Court of Appeals that, once the social worker told Jennifer Moses she had contacted CPS,

17  "Jennifer would have been aware of the potential implications of her statements to Muller, and,

18  under those circumstances, Muller's testimony about Moses's assault could be impermissible

19  testimonial hearsay under Crawford."  (Dkt. 10, Ex. 3 at 13.)  Nor do the parties discuss the state

20  court's subsequent determination that the admission of this testimony was nonetheless harmless.

21      As noted by the state court, in two post-*Crawford* cases finding statements made to social

22  workers testimonial, the social workers interviewed children on behalf of the state in order to

REPORT AND RECOMMENDATION
PAGE -21

01  gather evidence for a future prosecution or to develop the children's testimony for prosecution.

02  *See In re T.T.*, 815 N.E.2d 789, 800-03 (Ill. App. Ct. 2004) ("[W]here DCFS works at the behest

03  of and in tandem with the State's Attorney with the intent and purpose of assisting in the

04  prosecutorial effort, DCFS functions as an agent of the prosecution.");  *Snowden v. State*, 846

05  A.2d 36, 47 (Md. Ct. Spec. App. 2004) ("As the trial court stated: 'The children were interviewed

06  for the expressed purpose of developing their testimony by Ms. Wakeel, under the relevant

07  Maryland statute that provides for the testimony of certain persons in lieu of a child, in a child

08  sexual abuse case . . . .'"), *aff'd* 867 A.2d 314 (Md. 2005).  Here, as argued by respondent, it does

09  not appear that the social worker filled such a role.  (*See* Dkt. 10, Ex. 11 at 62-64 ("I intervene

10  in trauma cases.  I do drug and alcohol assessments.  I do suicidal and mental evaluations.  I do

11  domestic violence, CPS, pretty wide variety of things."; "My primary goal is to identify the abuse.

12  To inform them of the resources available in the community.  To educate them about what is

13  abuse.  And I provide supportive counseling, you know, educating them it's not their fault, that

14  kind of thing.  You know, a lot of them don't know about the domestic violence cycle.  They just

15  know they're not happy and things are happening to them.  Once identified, I hook them up to the

16  appropriate resource."))

17       It also should be noted that courts have deemed statements made to social workers

18  nontestimonial where not made with the purpose of producing a statement for trial.  *See, e.g.,*

19  *Scacchetti*, 711 N.W. 2d at 515 ("[E]ven if we were to conclude that Edinburgh's assessments of

20  R.J. had, as a secondary purpose, the preservation of testimony for trial, R.J.'s statement would

21  still not be testimonial. Because the broad purpose of Edinburgh's assessments was R.J.'s medical

22  health, any subsequent testimony that Edinburgh was required to give did not change her

REPORT AND RECOMMENDATION
PAGE -22

01  assessment purpose."); *State v. Bobadilla*, 709 N.W.2d 243, 246-47, 253-56 (Minn. 2006), *cert.*

02  *denied* 127 S.Ct. 382 (2006) (finding statements made by a child to a social worker

03  nontestimonial, despite police involvement and presence, where the interview "was initiated by a

04  child-protection worker in response to a report of sexual abuse for the overriding purpose of

05  assessing whether abuse occurred, and whether steps were therefore needed to protect the health

06  and welfare of the child.")  However, all of these social worker cases may be distinguished from

07  the situation involving the adult Jennifer Moses in that they address statements made by children.

08  *See, e.g., Bobadilla* , 709 N.W. 2d at 255-56 ("Moreover, given T.B.'s very young age, it is

09  doubtful that he was even capable of understanding that his statements would be used at a trial.

10  . . . [C]hildren of T.B.'s age are simply unable to understand the legal system and the

11  consequences of statements made during the legal process. . . .  An interview  with an older child

12  who understands the law-enforcement consequences of his statement, or an interview with more

13  significant law-enforcement involvement might both exhibit a greater purpose on the part of a

14  declarant or government questioner to produce statements for use at a future trial.")

15      In this case, given the lack of clarity in the record as to the precise course of the

16  conversation between Jennifer Moses and the social worker, the Court finds the state court's

17  approach in analyzing this issue reasonable and in accordance with federal law.  That is, as

18  discussed below, even assuming Jennifer Moses's statements were testimonial, the admission of

19  this testimony was harmless.

20      Relief may be granted on a federal habeas corpus petition only if the state court erred and

21  the error had a "substantial and injurious effect or influence" in determining the jury's verdict.

22

REPORT AND RECOMMENDATION
PAGE -23

01  *Brecht v. Abrahamson*, 507 U.S. 619, 623, 637 (1993).[4]  "Under this standard, error is harmless

02  if we can say with fair assurance that it did not have a substantial effect, injurious to the defendant,

03  on the jury's decision-making process."  *Arnold v. Runnels*, 421 F.3d 859, 867 (9th Cir. 2005).

04  Therefore, this Court must ask whether "'the error substantially influenced the jury's decision[.]'"

05  *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995).  If in "grave doubt" as to the effect of the error,

06  the Court cannot deem the error harmless.  *Id*. at 436-37.  The state "bears the 'risk of doubt' in

07  [this] harmless-error analysis."  *Valerio v. Crawford*, 306 F.3d 742, 762 (9th Cir. 2002) (quoting

08  *O'Neal*, 513 U.S. at 439).

09       As noted by the Washington Court of Appeals, the jury had before it a substantial amount

10  of properly admitted evidence of the 2001 assault. (  *See* Dkt. 10, Ex. 3 at 14 ("The untainted

11  independent evidence of the 2001 assault includes multiple witnesses who identified Moses as

12  Jennifer's assailant, evidence documenting Jennifer's injuries and expert testimony that Jennifer's

13  broken jaw was not the result of a slip and fall.  The officer responding to the 911 call also

14  described Jennifer's injuries and the scene at the house, including the phone ripped from the wall.

15  In addition, the jury heard testimony about arguments prior to Jennifer's death and an argument

16  four days before that resulted in Moses's arrest on an outstanding warrant for the pending

17  domestic violence charge, as well as heated argument the night of Jennifer's murder.  None of this

18

---

19       [4] In its original opinion in *Bockting*, the Ninth Circuit applied an erroneous harmless error

20  standard. 399 F.3d at 1022 (citing *Neder v. United States*, 527 U.S. 1 (1999)).  In its amended opinion, the Court corrected the error.  *Bockting*, 408 F.3d at 1127 (citing *Brecht*, 507 U.S. at

21  623, 637 ("[This] harmless-error standard is better tailored to the nature and purpose of collateral review than the [harmless beyond a reasonable doubt] standard, and application of a less onerous

22  harmless-error standard on habeas promotes the considerations underlying our habeas jurisprudence."))

REPORT AND RECOMMENDATION
PAGE -24

01 testimony violated Crawford."))  That evidence included the very same statement made by Jennifer

02 Moses to the emergency room doctor just prior to her conversation with the social worker.  In the

03 face of this cumulative and corroborating evidence, the Court stands fairly assured that any error

04 in the admission of Jennifer Moses's statement did not have a substantial and injurious effect on

05 the verdict obtained.

06       3.       Statements Made by Petitioner's Son to Social Worker:

07       As indicated above, petitioner argues that the state court's reasoning that his son's

08 statement was introduced to show why the social worker contacted CPS, rather than to establish

09 the truth of the matter asserted, is contrary to the well-established principle that evidence is not

10 admissible to establish a non-hearsay purpose which is not relevant to any issue at trial.    *See*

11 *Aaron*, 57 Wn. App. at 280-81.  He maintains that this evidence served to establish that petitioner

12 and Jennifer Moses had argued with one another and constituted impermissible testimonial

13 hearsay.

14       Respondent argues that the child's statement was not testimonial in the *Crawford* sense.

15 Respondent notes that the social worker's focus was on the child, not Jennifer Moses, and that the

16 statement was made during the emergency treatment of his mother, not during a non-emergency

17 police or government investigation.  Respondent also notes that the social worker did not notify

18 the police or the prosecutor's office regarding the child's statement.

19       In response to these arguments, petitioner asserts that CPS shared with law enforcement

20 the obligation to investigate and, where justified, report allegations of abuse and neglect.    *See*

21 RCW 26.44.050.  Petitioner also disputes the relevance of the social worker's motivations.

22       As previously reflected, the age of the declarant is pertinent to the testimonial analysis.  In

REPORT AND RECOMMENDATION
PAGE -25

01  this case, petitioner's younger son appears to have been four or five years old at the time of the

02  November 1, 2001 incident.  (*See* Dkt. 10, Ex. 10 at 7 (indicating that petitioner's younger son

03  was five years old at the time of his mother's death on September 26, 2002.))  This Court has

04  agreed with the reasoning of the Colorado Supreme Court that "'the "objective witness" language

05  in Crawford refers to an objectively reasonable person in the declarant's position.'"  *Miller*, 2006

06  U.S. Dist. LEXIS 17284 at *18-21 (quoting *Vigil*, 127 P.3d at 924).  In *Miller*, as in *Vigil*, the

07  Court determined that an objective seven-year-old would not believe statements made to a medical

08  professional would be available for use at a later trial.  *Id*. at 21; *Vigil*, 127 P.3d at 926.

09          This case differs from *Miller* and *Vigil* in that petitioner's son made the statement to a

10  social worker, rather than a doctor or nurse, and in regard to an incident involving his mother,

11  rather than himself.  *See*, *e.g.*, *Commonwealth v. DeOliveira*, 849 N.E.2d 218, 225-27, n.12

12  (Mass. 2006) (finding six-year-old's statements to doctor regarding sexual abuse in a medical

13  examination nontestimonial, but noting:  "Although Patricia had accompanied her mother to the

14  police station, where her mother obtained a protective order, Patricia's statements to the social

15  worker had included reference to the defendant hurting Patricia's mother, conduct that a young

16  child might more readily recognize as criminal.")  The Court nonetheless questions whether an

17  objectively reasonable four- or five-year-old, waiting in the hospital while his mother underwent

18  emergency medical treatment for a serious injury, would reasonably believe that statements he

19  made to a social worker employed by the hospital would later be used in a criminal prosecution

20  of his father.  Nor is it clear that, even if properly deemed testimonial, the statement identifying

21  petitioner as his mother's assailant could be said to have had a substantial and injurious effect on

22  the jury's verdict.  Indeed, as stated above, the jury had before it properly admitted cumulative and

REPORT AND RECOMMENDATION
PAGE -26

01  corroborating evidence of the 2001 assault, as well as to a history of alleged domestic violence.

02      However, the Court need not decide whether the statement is testimonial pursuant to

03  *Crawford/Davis*.  As noted by the Washington Court of Appeals, the Supreme Court in *Crawford*

04  clarified that the confrontation clause "does not bar the use of testimonial statements for purposes

05  other than establishing the truth of the matter asserted."  541 U.S. at 59 and n.9.  Here, the state

06  court admitted the statement not for the truth of the matter asserted, but to show why the social

07  worker contacted CPS.  (*See* Dkt. 10, Ex. 3 at 13.)

08      The trial record supports the state court's finding.  The social worker testified as to the

09  mandatory reporting law requiring her to contact CPS if a child witnesses domestic violence and

10  stated, *inter alia*: "When I interviewed the kids, [F] had told me that last night he saw his Dad kick

11  his Mom in the head.  So based on that information, that was obviously reason enough right there

12  to call [CPS], because he witnessed the violence."  ( *Id.*, Ex. 11 at 64-68.)  The record further

13  documents the trial court's thinking on the admission of this testimony:

14          We had one side bar regarding the topic of CPS.  Defense was objecting to the
          question about the statements alleged to have been made by the children.
15

16          In pretrial I had commented that this case was not about CPS, that the CPS
          file had been closed, and that I did not believe it was a relevant area for inquiry.
          Nonetheless, it was a significant part of defense opening and there were questions on
17          this.

18          I do find that that door was opened and that is why I allowed that, to explain
          the referral to CPS, which had been made an issue in the case.
19

20  (*Id*. at 86.)  Petitioner's trial counsel, also serving as his counsel in this Court, "agree[d] with that

21  ruling." (*Id*.)

22      Also, as indicated by the trial judge, petitioner's counsel did make the CPS issue a part of

REPORT AND RECOMMENDATION
PAGE -27

01 his case, stating in opening argument:

> That evening Jennifer went to the hospital with a broken jaw. CPS got involved; an
> added pressure. CPS got involved about the problems that they were told about from
> the hospital because of the alcohol involved, there were some barbituates or drugs
> found in her system, and also they were concerned about domestic violence. CPS got
> involved and Jeff went into treatment.

05 (*Id.*, Ex. 10 at 28-29.) As such, it cannot be said that, as argued by petitioner, this evidence was

06 not relevant to any issue at trial.

07        In sum, for all of the reasons stated above, the Court finds no basis for concluding that the

08 state court's ruling as to the statement of petitioner's son was contrary to, or involved an

09 unreasonable application of, clearly established federal law.

10 B.        Reliability of Nontestimonial Statements

11        The Court must now determine whether nontestimonial statements were properly admitted

12 under the reliability test articulated in *Ohio v. Roberts*. *See Crawford*, 541 U.S. at 68 ("Where

13 nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford States

14 flexibility in their development of hearsay law – as does *Roberts*, and as would an approach that

15 exempted such statements from Confrontation Clause scrutiny altogether.") As stated above,

16 under *Roberts*, an out-of-court statement meets the reliability test if it falls within a "firmly rooted

17 hearsay exception" or bears "particularized guarantees of trustworthiness." 448 U.S. at 66.

18        In this case, the trial court correctly deemed Jennifer Moses's statement to the doctor as

19 falling within the hearsay exception covering statements made for purposes of medical diagnosis

20 or treatment. (*See* Dkt.10, Ex. 3 at 9-10.) As such, the only nontestimonial statement at issue here

21 meets the *Roberts* reliability test in falling within a firmly rooted hearsay exception. *See White v.*

22 *Illinois*, 502 U.S. 346, 355 & n.8 (1992) (expressing "no doubt" that the exception for statements

REPORT AND RECOMMENDATION
PAGE -28

01  made for purposes of medical diagnosis or treatment is "'firmly rooted'"); *United States v. Hall*,

02  419 F.3d 980, 987 (9th Cir. 2005) ("Hawkins' statements to Dr. Grover, including that her live-in

03  boyfriend had caused her injuries, were statements made for the purpose of medical diagnosis or

04  treatment, and also hearsay exceptions. *See* Fed. R. Evid. 803(4)(describing as exceptions to the

05  hearsay rule all 'statements made for purposes of medical diagnosis or treatment . . . or the

06  inception or general character of the cause or external source thereof insofar as reasonably

07  pertinent to diagnosis or treatment')."), *cert. denied* 126 S. Ct. 838 (2005).

08  <u>Ground Two</u>

09      In his second ground for relief, petitioner asserts that the trial court's exclusion of evidence

10  pertinent to the defense's suicide theory denied him his constitutional right to appear and defend

11  at trial and to present evidence in his own behalf.  In particular, he points to the exclusion of

12  expert testimony from Dr. Lawrence Wilson, an autopsy photograph of Jennifer Moses, and

13  evidence contained within the journals of Jennifer Moses.  Petitioner avers that, although finding

14  error in the exclusion of Jennifer Moses's private journal in favor of her on-line journal, the Court

15  of Appeals failed to acknowledge the constitutional dimension of the issue.  Petitioner adds: "Even

16  in the on-line journal and her medical records her threats regarding the children, evidence of her

17  eating disorder and her childhood sex abuse which contributed to her depression and alcoholism

18  were deleted."  (Dkt. 1 at 7.)

19      In considering these issues, the Washington Court of Appeals held as follows:

20  <u>Suicide Defense Evidence</u>

21          Moses argues the trial court's decision to exclude expert witness testimony
        and other relevant evidence deprived him of the ability to present his suicide defense.
22      Specifically, Moses points to the court's exclusion of expert opinion testimony

REPORT AND RECOMMENDATION
PAGE -29

regarding Jennifer's depression, an autopsy photograph of Jennifer, and extracts from Jennifer's written journals describing her depression and her thoughts of suicide.

The admissibility of evidence rests within the sound discretion of the trial court and will not be disturbed unless no reasonable person would adopt the trial court's view.  State v. Atsbeha, 142 Wn.2d 904, 913-14, 16 P.3d 626 (2001).  A criminal defendant has a constitutional right to present a defense.  Washington v. Texas, 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967).  Defendants have the right to present a defense, but do not have the right to introduce evidence that is irrelevant or otherwise inadmissible.  State v. Rehak, 67 Wn. App. 157, 162, 834 P.2d 651 (1992).  A trial court may, in its discretion, reject evidence where the evidence is vague, or where the evidence is merely argumentative and speculative.  State v. Knapp, 14 Wn. App. 101, 108, 540 P.2d 898 (1975).

Moses argues the trial court's exclusion of expert testimony from Dr. Lawrence Wilson violated his right to present a defense.  Dr. Wilson would have testified regarding the nature of Jennifer's depression, the ability of a person who was severely depressed to appear normal to friends and co-workers, and the likelihood that someone with Jennifer's degree of depression together with other risk factors might commit suicide.

Admissibility of expert testimony is governed by ER 702.  ER 702 requires that (1) the witness is qualified as an expert and (2) the testimony would be helpful to the trier of fact.  State v. Farr-Lenzini, 93 Wn. App. 453, 461, 970 P.2d 313 (1999).  Expert testimony is helpful if it concerns matters beyond the common knowledge of the average layperson and does not mislead the jury.  Id.

In State v. Thomas, this court affirmed the trial court's decision to exclude expert testimony offered to support the defense of diminished capacity.  123 Wn. App. 771, 781, 98 P.3d 1258 (2004).  In Thomas, the defense expert would have testified regarding the defendant's history of alcohol use, and that it was possible that the defendant suffered a blackout on the night of the assault.  We concluded the court did not abuse its discretion in excluding the testimony because the expert could not testify that the defendant had consumed enough alcohol that night to suffer a blackout, or that a mental disorder impaired the defendant's ability to form the requisite intent.  Thomas, 123 Wn. App. at 781.

Here, Dr. Wilson was retained to form an opinion based only on the records provided by Moses.  Other medical providers, who treated Jennifer, testified about her depression, her suicidal ideation, and her alcohol and drug addiction.  The jury heard testimony from four medical providers.  The Valley General doctor testified that Jennifer had severe depression in March 2002.  The chemical dependency counselor described Jennifer's depression, suicidal ideation and cocaine binges.  Jennifer's Hall

REPORT AND RECOMMENDATION
PAGE -30

01 Health Center counselor from January to March 2002, testified about Jennifer's
02 depression, that depression is a serious, life-threatening illness and that improvement
is unlikely if a person uses drugs and alcohol.  Because the treatment provider, who
treated Jennifer's chemical dependency between April and August of 2002, had died,
03 the records custodian read the provider's notes to the jury.  These notes reflected
Jennifer's past suicidal ideation and her major and recurrent depression.  During
04 cross-examination, Moses also elicited testimony from the medical examiner that
alcohol, drugs and access to firearms present an increased risk of suicide.  Finally, the
05 trial court admitted all references from Jennifer's medical records to suicidal ideation
and depression for the entire year and all references from her online journal for the
06 four-month period before her death.

07 The court ruled the only additional expert testimony Dr. Wilson could provide
was that in his opinion that Jennifer had a 0.25 percent increased chance of
08 committing suicide during the six months between diagnosis of depression and time
of her death.  Dr. Wilson could not testify about whether Jennifer was suicidal the
09 night of her death – "I would not at this point state that, to a reasonable degree of
medical certainty, I think she committed suicide."  Based on the defense offer of
10 proof, the court concluded that Dr. Wilson's testimony was not helpful to the trier of
fact under ER 702.  We conclude the court did not abuse its discretion in excluding
11 Dr. Wilson's testimony.  As in Thomas, Dr. Wilson could not testify that Jennifer was
suicidal on the night she died, but only that she was in the category of people for
12 whom the risk of suicide is marginally greater than the average person.  Moses was
able to elicit the same type of information regarding depression and suicide from other
13 witnesses including Jennifer's treatment providers and the medical examiner.

14 Moses also argues that the court's exclusion of the autopsy photograph and
Jennifer's written journal entries violated his right to present a suicide defense.
15 Photographic evidence is admissible if the probative value outweighs the prejudicial
effect.  State v. Kendrick, 47 Wn. App. 620, 624, 736 P.2d 1079 (1987).  The
16 determination of whether a photograph's probative value is outweighed by its
prejudicial effect is left to the sound discretion of the trial court, and the trial court's
17 ruling will not be disturbed on appeal absent an abuse of that discretion.  Id.  Moses
wanted to introduce an autopsy photograph showing Jennifer's emaciated body so the
18 jury could see how much weight Jennifer had lost.  But multiple witnesses testified
that Jennifer had lost 20 pounds in the months prior to her death and the court
19 permitted the defense to question its medical expert about her weight loss.  In
addition, the court admitted other photographs showing Jennifer's upper torso.  The
20 probative value of the autopsy photograph was minimal and the trial court did not
abuse its discretion in finding the probative value did not outweigh its prejudicial
21 effect.

22 Jennifer kept two journals, one that was handwritten and private, and one that

REPORT AND RECOMMENDATION
PAGE -31

was on-line.  The trial court admitted entries from the two journals for the four months prior to Jennifer's death.[5]  The trial court reasoned that further back in time was too remote to be probative of Jennifer's state of mind on the night she died.

When the journal entries overlapped, the court admitted only the online journal and excluded the written journal.  The trial court decided that the online journal indicated her "state of mind that day or mood and some description of how she was feeling" and the paper journal did not.  According to Moses, the court improperly excluded several passages from Jennifer's written journal on this basis.  On appeal, Moses points only to the following excluded entry from the four-month period before Jennifer's death:[6]

> I think mostly my feeling/thought has been why on earth would I want to be born on this place in this existence?  It is so miserable.  That thought has been very clear and loud and I can think back as far as I can remember and recall being unhappy about this life and my existence I've been asking god to take the fucking pain away since I was 8 years old!  Probably sooner.

We conclude the trial court's decision to limit admission of the journal entries to four months prior to Jennifer's death was not an abuse of discretion.  But, the decision to exclude excerpts from her private journal in favor of the public online journal, and the court's decision to admit only the online journal entries was an abuse of discretion.  However, we conclude the erroneous exclusion of the private journal entries harmless. [sic]  The trial court admitted relevant parts of the medical records related to Jennifer's depression and suicidal ideation for the entire year before her death.  The court also admitted a number of other statements from Jennifer's journals regarding her state of mind.  And Moses' counsel effectively read and emphasized many of these journal entries in closing argument.

(Dkt. 10, Ex. 3 at 17-22 (footnote containing exact language of ER 702 and footnotes containing only citations to record omitted.))

Petitioner objects to the characterization of the exclusion of this evidence as merely

---

[5] [State court's footnote] There was no written journal for the period of two months prior to her death, and no online journal for one month prior.

[6] [State court's footnote] The other journal entries Moses points to in his brief as improperly excluded were prior to the four-month cut-off date.

REPORT AND RECOMMENDATION
PAGE -32

01  evidentiary error.  He argues that the exclusion of this evidence conflicts with controlling Supreme

02  Court authority upholding the right to compulsory process, to appear and defend at trial, and to

03  offer evidence in one's own behalf.  *See Crane v. Kentucky*, 476 U.S. 683, 690 (1986) ("Whether

04  rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory

05  Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal

06  defendants 'a meaningful opportunity to present a complete defense.'") (quoting *California v.

07  Trombetta*, 467 U.S. 479, 485 (1984)) (internal citations omitted); *Washington v. Texas*, 388 U.S.

08  14, 19 (1967) ("The right to offer the testimony of witnesses, and to compel their attendance, if

09  necessary, is in plain terms the right to present a defense, the right to present the defendant's

10  version of the facts as well as the prosecution's to the jury so it may decide where the truth lies.

11  Just as an accused has the right to confront the prosecution's witnesses for the purpose of

12  challenging their testimony, he has the right to present his own witnesses to establish a defense.

13  This right is a fundamental element of due process of law.")  He points to Supreme Court case law

14  upholding the right to a meaningful opportunity to present a defense in the face of state procedural

15  and evidentiary rules.  (*See* Dkt. 1, Attach. 1 at 10-11.)

16      Petitioner further argues that, even when evidence is not otherwise admissible, a defendant

17  maintains a due process right to rebut arguments presented by the state.  *See Simmons v. South

18  Carolina*, 512 U.S. 154, 164-65 (1994).  He avers that, in this case, the trial court consistently

19  thwarted his attempts to present evidence rebutting the impression that Jennifer Moses was over

20  her major depression and other problems at the time of her death, and had only one real problem

21  – her husband.

22      The Compulsory Process Clause of the Sixth Amendment guarantees a defendant the right

REPORT AND RECOMMENDATION
PAGE -33

01  to present testimony "both material and favorable to his defense." *United States v. Valenzuela-*

02  *Bernal*, 458 U.S. 858, 867 (1982).  The Fourteenth Amendment guarantees a defendant the right

03  to a fair trial.  *Spencer v. Texas*, 385 U.S. 554, 563-64 (1967) ("Cases in this Court have long

04  proceeded on the premise that the Due Process Clause guarantees the fundamental elements of

05  fairness in a criminal trial.")

06       In order to determine whether exclusion of evidence violates the Due Process Clause or

07  the Sixth Amendment, the Ninth Circuit typically employs a five-part balancing test. *United States*

08  *v. Duran*, 41 F.3d 540, 545 (9th Cir. 1994).  That test looks to:

09       (1) the probative value of the excluded evidence on the central issue; (2) its reliability;
        (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole
10       evidence on the issue or merely cumulative; and (5) whether it constitutes a major part
        of the attempted defense.

11

12  *Tinsley v. Borg*, 895 F.2d 520, 530 (9th Cir. 1990).  The Court then  "balance[s] the importance

13  of the evidence against the state interest in exclusion." *Id.*  In this case, for the reasons described

14  below, the balance of factors supports the state court's exclusion of the evidence.

15       As an initial matter, the Court notes petitioner's failure  to demonstrate that any specific

16  evidentiary rule relied upon by the state court in reaching its conclusions unconstitutionally

17  infringed upon his right to present a complete defense.  For example, ER 702, relied on in the

18  decision to exclude the testimony of Dr. Wilson, may be clearly distinguished from the rules at

19  issue in the Supreme Court cases cited by petitioner in support of his argument. *See, e.g., Holmes*

20  *v. South Carolina*, ___ U.S. ___, 126 S. Ct. 1727, 1734-35 (2006) (finding state rule excluding

21  evidence of third-party guilt where there is strong evidence of guilt unconstitutionally deprived a

22  defendant of a meaningful opportunity to present a defense); *Washington*, 388 U.S. at 16-17, 23

REPORT AND RECOMMENDATION
PAGE -34

01  (statute prohibiting persons charged or convicted as coparticipants in the same crime from

02  testifying for one another unconstitutionally denied the defendant his right to have compulsory

03  process for obtaining witnesses in his favor).

04      Nor does petitioner otherwise demonstrate that the trial court's evidentiary rulings violated

05  his rights under the Sixth or Fourteenth Amendments.  Numerous witnesses at trial testified as to

06  Jennifer Moses's depression, suicidal ideation, and alcohol and drug addiction, and the trial court

07  allowed documentary evidence attesting to these same issues.  Testimony from Dr. Wilson on

08  these subjects would have been merely cumulative and of low probative value given that the

09  conclusion as to the risk of suicide was within the common understanding of the jury.

10      The trial court also admitted numerous journal entries pertinent to petitioner's suicide

11  defense.  (*See, e.g.,* Dkt. 10, Ex. 7 at 26 ("I longed for death at Sauusong.  Instead of air I was

12  dirt and flowers grew from my body; they were yellow."), 54-55 ("I have been asking God to take

13  the fucking pain away [. . . ] since I was eight years old."), and 56 ("And there may be some other

14  point to being alive, but I don't know what.")) (*See also* Dkt. 10., Ex. 9 at 19 ("We have had an

15  extensive discussion of Ms. Moses' written journal, which is lengthy and includes a great deal of

16  information which is completely irrelevant to this trial. . . . I will note again what I did allow were

17  her statements about depression, suicidal thoughts, and the like.")) As noted by the Washington

18  Court of Appeals, petitioner's counsel made use of these journal entries in his arguments.  (*See*

19  *generally* Dkt. 10, Exs. 10 and 15.)  As such, the excluded journal entries would have been, like

20  the testimony of Dr. Wilson, unnecessarily cumulative.

21      Finally, the jury had before it sufficient evidence as to Jennifer Moses's weight loss prior

22  to her death (*see, e.g.,* Dkt. 10, Ex. 13 at 50 (medical testimony that Jennifer Moses had recently

REPORT AND RECOMMENDATION
PAGE -35

01    lost twenty pounds), including photographs of her upper torso.  The state's interest in excluding

02    the autopsy photographs exceeded the importance of this additional evidence of weight loss.

03         Petitioner fails to demonstrate that the exclusion of Dr. Wilson's testimony, portions of

04    Jennifer Moses's diaries, and the autopsy photograph prevented him from presenting a complete

05    defense, or that the exclusion of this evidence deprived him of a fundamentally fair trial.  The state

06    court's decision was neither contrary to, nor an unreasonable application of, clearly established

07    federal law.

08                                    Ground Three

09         In his third ground for relief, petitioner asserts denial of his Sixth Amendment right to a

10    jury trial through the admission of opinion testimony as to guilt which invaded the province of the

11    jury.  *See, e.g., United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("Generally, the use of

12    expert testimony is not permitted if it will 'usurp either the role of the trial judge in instructing the

13    jury as to the applicable law or the role of the jury in applying that law to the facts before it.'

14    When an expert undertakes to tell the jury what result to reach, this does not aid the jury in making

15    a decision, but rather attempts to substitute the expert's judgment for the jury's.") (quoted and

16    cited sources omitted).  He challenges testimony from Dr. Richard Harruff, ballistics expert Evan

17    Thompson, and social worker Tamara Muller.

18         In considering this claim, the Washington Court of Appeals held as follows:

19    Improper Opinion Testimony

20         Moses claims the testimony of the medical examiner and the ballistic forensic
      expert that Jennifer's death was classified as a homicide was improper testimony that
21    violated his constitutional right to a jury trial.  Improper opinion on guilt violates a
      defendant's constitutional right to a jury trial and the independent determination of
22    the facts by the jury.   State v. Carlin, 40 Wn. App. 698, 701-702, 700 P.2d 323

REPORT AND RECOMMENDATION
PAGE -36

(1985) overruled on other grounds by <u>City of Seattle v. Heatley</u>, 70 Wn. App. 573, 854 P.2d 658 (1993).  As a general rule, no witness, lay or expert, may "testify to his opinion as to the guilt of a defendant, whether by direct statement or inference." <u>State v. Black</u>, 109 Wn.2d 336, 348, 745 P.2d 12 (1987).  Such testimony has been characterized as unfairly prejudicial because it "invad[es] the province of the finder of fact."  <u>Id</u>. at 348.  But testimony that is not a direct comment on a defendant's guilt, is otherwise helpful to the jury, and is based on inferences from the evidence is not improper opinion testimony.  <u>State v. Sanders</u>, 66 Wn. App. 380, 388, 832 P.2d 1326 (1992).  The trial court is accorded broad discretion to determine the admissibility of testimony.  Whether testimony constitutes an impermissible opinion on guilt will generally depend on the record and the circumstances of each case, including the type of witness involved, the specific nature of the testimony, the nature of the charges, the type of defense, and the other evidence before the trier of fact. <u>Heatley</u>, 70 Wn. App. at 579.

In <u>State v. Jones</u>, this court held the opinion testimony of two experts that the death of a four-month-old child could not have occurred in the manner described by the defendant did not invade the province of the jury because the doctors did not testify that the defendant actually inflicted the injury.  59 Wn. App. 744, 751, 801 P.2d 263 (1990).  The doctors' opinions in <u>Jones</u> were based on the physical injuries to the child and whether they could be caused by roughly pulling the child out of a swing as the defendant claimed.  <u>Id</u>. at 750.

Other courts have held that medical examiner testimony classifying a death as a homicide does not invade the province of the jury.  For instance, in <u>State v. Bradford</u>, the victim was found with a gunshot wound to the head.  618 N.W.2d 782, 787 (Minn. 2000).  <u>Id</u>.  The defendant claimed the victim committed suicide.  <u>Id</u>.  The court held that the medical examiner's testimony that the death was homicide was admissible because a lay juror may not be able to differentiate between a self-inflicted gunshot wound and a gunshot wound inflicted by another, and the testimony did not impermissibly address intent.  <u>Id</u>.[7]

Both the medical examiner and the ballistics expert testified that they classified Jennifer's death as homicide.  The medical examiner, Dr. Harruff, explained that the

[7] [State court's footnote]  <u>See also Willis v. State</u>, 274 Ga. 699, 701, 558 S.E.2d 393 (2002) (Homicide has no legal type meaning and testimony did not invade province of jury on whether death was intentional or accident); <u>Sippio v. State</u>, 350 Md. 633, 655, 714 A.2d 864 (1998) (Testimony of homicide did not invade province of jury where ultimate issue was whether defendant shot the victim intentionally or accidentally); <u>State v. Richardson</u>, 158 Vt. 635, 636, 603 A.2d 378 (1992) (Testimony regarding homicide did not intrude upon the role of the jury because the jury still had to decide the ultimate question of whether the defendant was involved.).

REPORT AND RECOMMENDATION
PAGE -37

homicide classification is used to determine whether a death needs to be investigated. Dr. Harruff made it clear that classifying a death as a homicide has nothing to do with the jury's decision or a defendant's intent because "that's not my job" and that "I am not in a position, as the jury is, to render, a final conclusion as to whether this represents a murder or not." The firearms expert, Thompson, testified that he classified the death as homicide based on in [stet] his experience and the position of the wound combined with the force required to pull the trigger.[8] On this record, we conclude that the testimony of Dr. Harruff and Thompson that Jennifer's death was classified as a homicide was not impermissible opinion testimony.

Moses also argues that Dr. Harruff's testimony was not helpful to the jury and impermissibly invaded the province of the jury because he relied on factors outside his area of expertise. We disagree. In direct and redirect examination, Dr. Harruff's testimony was based on the facts regarding Jennifer's injuries and that the gunshot wound was a contact wound. On cross-examination, Moses' lawyer elicited testimony that Dr. Harruff had read portions of Jennifer's journal and had read Moses' police statement. But Dr. Harruff made clear that because this information was ambiguous, he limited the classification of Jennifer's death to objective factors. Dr. Harruff testified that the objective factors he relied on included the wound location, the fact that it was a contact wound, the orientation of the weapon, and the difficulty of the gun's trigger pull. Dr. Harruff explained that it was not his role to determine whether a death was a murder. At no point did Dr. Harruff tell the jury what conclusion to reach. Under these circumstances, we conclude Dr. Harruff's testimony did not improperly invade the province of the jury.[9]

(Dkt. 10, Ex. 3 at 22-25 (internal citations to record omitted.))

Petitioner rejects the contention that Dr. Harruff relied only on objective factors, pointing again to his consideration of, among other things, petitioner's statements and portions of Jennifer

---

[8] [State court's footnote] Moses' argument that Thompson's testimony was not helpful to the jury is without merit because the trigger pull of a derringer is outside the knowledge of the average juror.

[9] [State court's footnote] Moses also argues that Tamara Muller's testimony that a domestic violence victim is most likely to be killed when she leaves home was impermissible opinion testimony as to guilt. Because Moses did not object at trial, he has not preserved this issue for appeal. RAP 2.5(a). In any event, Muller did not testify as an expert and his [stet] statement did not refer specifically to Moses.

REPORT AND RECOMMENDATION
PAGE -38

01   Moses's journals.  He maintains that Dr. Harruff testified that Jennifer Moses's death was a

02   murder and that this told the jury what verdict to reach.  Petitioner further argues a lack of

03   foundation for Thompson's opinion that the death was a homicide, pointing to his admission that

04   most contact wounds are suicide and that suicide could not be excluded in this case.  Finally,

05   petitioner describes Muller's testimony that a domestic violence victim is most likely to be killed

06   when she leaves home as an impermissible opinion as to guilt and not established by any reliable

07   data.  However, a review of the record in this case does not bear out petitioner's contentions.

08          Dr. Harruff acknowledged his consideration of different types of evidence, but clarified:

09      I tried to limit myself to making the conclusion based on objective factors that I could
        repeat and seem to be unambiguous factors.  And this being a difficult case, I tried to
10      avoid subjective factors.  And finding that the psychological components were
        ambiguous, there were indicators one way and there were indicators the other way
11      that did not help me terribly, so I tried to base the classification on the objective
        factors.

12

13   (Dkt. 10, Ex. 16 at 28-29.)  He thereafter agreed that the forensic or objective factors he

14   considered included the fact that it was a contact wound, a contact wound on a particular body

15   location, that the orientation of the weapon was "sight basically up[,]" and information from the

16   ballistics expert as to the difficulty of pulling the weapon's trigger.  (*Id*. at 29-30.)  Dr. Harruff

17   also later distinguished his testimony from the role of the jury:

18      Q.   Now, when you classify something as homicide, suicide, accidental or
             undetermined, is that a legal standard or a medical standard?
19
20      A.   We refer to it as a medical/legal standard as coming from our capacity of
             medical/legal investigators.  And principle purpose is for death certification,
             that we certify the deaths according to manner, and those particular manners
21           have legal implications.

22                 For example, I would classify something homicide if the evidence

REPORT AND RECOMMENDATION
PAGE -39

01  that I see, based on my experience and professional responsibility, indicates that this is a death that needs to be looked at for potential of criminal activity. That's my responsibility, and I certify death based on that.

03  I'm of course not in a position, as the jury is, to render a final conclusion as to whether this represents a murder or not.

04

Q.   Right.  In other words, what you're talking about has nothing to do with intent, does it, legal intent?

A.   No, that's not my job.  My job is to determine, as best I can, that there's a likelihood of another person's responsibility leading to this death.

. . .

Q.   And you're not determining that beyond a reasonable doubt, are you?

A.   No, I'm merely representing my capacity as a medical examiner and certifier of death and my position within the legal process.  Not trying to minimize it, but also not trying to indicate that I have anything close to the final conclusion.

12  (*Id.* at 34-35.)  Given the above, it cannot be said that Dr. Harruff improperly rendered an opinion

13  as to petitioner's guilt.

14  Nor did Thompson or Muller improperly opine as to petitioner's guilt.  Thompson, while

15  conceding the possibility of a self-inflicted wound, rendered an opinion that the death was a

16  homicide based on factors such as the "muzzle stamp, the location and the sight orientation," and

17  based on his experience, training, and analysis of photographs and the weapon.  (Dkt. 10, Ex. 17

18  at 21-22.)  Muller, rather than making a statement particular to petitioner, merely responded to

19  a general question regarding her experience giving advice to victims of domestic violence by

20  stating that she "very seldom" told victims of domestic violence to leave the situation immediately,

21  because they are most likely to be killed when they leave.  (*Id.*, Ex. 11 at 83.)

22  Petitioner fails to cite any case law supportive of the contention that the above-described

REPORT AND RECOMMENDATION
PAGE -40

01  testimony unconstitutionally invaded the province of the jury and denied him his rights under the

02  Sixth Amendment.[10]   Nor does he demonstrate that the testimony otherwise violated his

03  constitutional rights.  *See, e.g., Hamilton v. Vasquez*, 17 F.3d 1149, 1159 (9th Cir. 1994) ("Claims

04  of inadmissibility of evidence are cognizable in habeas corpus proceedings only when admission

05  of the evidence violated the defendant's due process rights by rendering the proceedings

06  fundamentally unfair."); *Jammal v. Van De Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) ("Only if

07  there are *no* permissible inferences the jury may draw from the evidence can its admission violate

08  due process. Even then, the evidence must 'be of such quality as necessarily prevents a fair trial.'")

09  (emphasis in original; quoted source omitted).  Accordingly, petitioner fails to demonstrate that

10  the decision of the state court was contrary to, or involved an unreasonable application of, clearly

11  established federal law.

12

13

14

15

16

17  _____

18  [10] *Cf. Samples v. Atlanta*, 916 F.2d 1548, 1552 (11th Cir. 1990) ("The plaintiffs contend
that the court also erred in allowing Detective Genson to testify as to whether based upon his
19  investigation of the shooting he thought the shooting was justified. Again, we agree that the
question as posed could tend to elicit a response that would invade the province of the jury, but
20  it is clear from the entirety of the testimony presented by Detective Genson that his investigation
focused on determining whether the shooting happened as Officer Oglesby said it did, and whether
21  criminal charges could be brought against Officer Oglesby for homicide. Thus, Detective Genson's
opinion that the shooting was 'justified' meant only that he determined that the physical evidence
22  supported Officer Oglesby's description of what had happened and that no criminal charges should
be brought against the officer.")

REPORT AND RECOMMENDATION
PAGE -41

01                                              V

02          For the reasons described above, petitioner's habeas petition should be denied, and this

03  action dismissed.  A proposed Order of Dismissal accompanies this Report and Recommendation.

04  No evidentiary hearing is required as the record conclusively shows that petitioner is not entitled

05  to relief.

06          DATED this 9th day of January, 2007.

07

08                                              _____
                                                Mary Alice Theiler
                                                United States Magistrate Judge
09

10

11

12

13

14

15

16

17

18

19

20

21

22

REPORT AND RECOMMENDATION
PAGE -42